UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

R.H., et al.,

    Plaintiffs,

v.

COUNTY OF LAKE, et al.,

    Defendants.
_____/

No. C 11-2396 PJH

**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT AND SETTING CASE MANAGEMENT CONFERENCE**

The motion for summary judgment filed by defendants William T. Durkin, M.D. ("Durkin") and William T. Durkin, Jr., M.D., Inc. came on for hearing before this court on May 15, 2013. Plaintiffs appeared through their counsel, Scott Montgomery. Defendants appeared through their counsel, Scott Kanter. Having read all the papers and carefully considered the relevant legal authority, and good cause appearing, the court hereby GRANTS in part and DENIES in part defendants' motion for summary judgment as follows.

**BACKGROUND**

This case arises out of the suicide of Jimmy Ray Hatfield ("Hatfield" or "the decedent"). On May 15, 2010, Hatfield's parents (with whom Hatfield lived) called the Lake County Mental Health ("LCMH") emergency line, because Hatfield had been showing signs of severe mental illness. LCMH notified the Clearlake Police Department that a "Code 5150" situation had developed, and the police sent three officers to the Hatfield home for a "welfare check." After finding Hatfield barricaded in his room, the police eventually used force to remove him and transport him to the emergency room ("ER") at St. Helena Hospital Clearlake.

Hatfield's hospital registration record noted that he was being seen for a "5150

evaluation." Hatfield was first seen by a triage nurse (Lisa Denny), who performed an initial assessment, and noted that he was "disoriented to place, disoriented to time, disoriented to situation," and that he was "articulating paranoid thoughts," and "agitated, aggressive, combative, [and] hallucinating." In the assessment, Nurse Denny also wrote under "reason for visit history" that Hatfield was "barricaded in house with weapons and possibly explosives," and that he was "non cooperative," and "combative with law enforcement."

Hatfield was then seen by Dr. Durkin, who filled out a form ordering Haldol (an anti-psychotic) and Ativan (a sedative) to be administered. Those medications were administered by Nurse Elizabeth Shires, who testified that she verbally informed Hatfield that she was going to administer them, and that he "did not object and said 'okay.'" However, after the medication was administered, Durkin ordered that Hatfield be placed in physical restraints. Durkin also checked a box on Hatfield's form indicating that he had reviewed Nurse Denny's initial assessment, and further noted that Hatfield had "barricaded self in house - threatened to blow it up," had experienced "escalating hallucinatory behavior for 1-2 weeks at home," and had experienced past psychiatric problems and was exhibiting "combative behavior."

After about two hours, Hatfield was sent to the x-ray department for an x-ray of his wrist (the parties dispute whether he was still in physical restraints at this time). Hatfield's arm was put in a splint, his wounds were cleaned, and he was given discharge instructions. At first, Durkin checked a box that Hatfield was "cleared medically for psychiatric referral," but then later filled out a different form stating that Hatfield was "medically safe to detain and incarcerate." Durkin claims that the first form was filled out in error.

Hatfield was then discharged to the Lake County Jail instead of a psychiatric facility. According to plaintiffs, Lake County Mental Health personnel attempted to conduct a 5150 mental health examination on Hatfield while he was in the hospital, but was refused access to him by the officers, who advised that any further mental health evaluation would occur at the jail. No mental health examination was conducted at the jail, and on the morning of May 17, 2010, Hatfield was found unresponsive after hanging himself with a bedsheet.

Plaintiffs filed suit on May 16, 2011, asserting claims against defendants from Lake County Mental Health, the Clearlake Police Department, and St. Helena Hospital, among others. The operative third amended complaint ("TAC") was filed on September 11, 2012. This motion involves only the two causes of action asserted against Dr. Durkin and his company; namely, plaintiffs' first cause of action (under section 1983), and plaintiffs' fifth cause of action (wrongful death). Plaintiffs do not oppose defendants' motion as to Dr. Durkin's company, so as to defendant William T. Durkin, M.D, Inc., the motion for summary judgment is GRANTED as to all claims asserted against it. Thus, the issues now before the court are whether Durkin is entitled to summary judgment on the two claims asserted against him in his individual capacity.

**DISCUSSION**

A.  Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential

3

1  element of the nonmoving party's case," or by showing, "after suitable discovery," that the
2  "nonmoving party does not have enough evidence of an essential element of its claim or
3  defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co.,
4  Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S.
5  at 324-25 (moving party can prevail merely by pointing out to the district court that there is
6  an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

B.  Legal Analysis

First, the court will address plaintiffs' wrongful death claim. In order to succeed on a claim for wrongful death arising out of medical negligence, a plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." Hanson v. Grode, 76 Cal.App.4th 601, 606 (1999). Durkin argues that plaintiffs have failed to show that his conduct breached the applicable standard of care, and thus argues that he is entitled to summary judgment. As part of their opposition brief, plaintiffs included the expert declaration of Dr. Bruce Wapen, who opines that Durkin did indeed breach the applicable standard of care. Durkin makes two challenges to Dr. Wapen's declaration. First, Durkin argues that Dr. Wapen is not qualified to provide expert testimony on this subject, because he does not have "substantial professional experience within the last five years while

4

assigned to provide emergency medical coverage in a general acute care hospital emergency department," as required by California Health and Safety Code section 1799.110. Second, Durkin argues that Dr. Wapen's opinions lack foundation, because they are not based on facts known to Durkin at the time of treatment.

As to the first challenge, the court notes that Durkin does not provide any concrete reason to exclude Dr. Wapen's testimony. Durkin argues that "Dr. Wapen has not been assigned to provide emergency medical coverage in a <u>general acute hospital emergency department</u> and instead has been 'continuously' employed in a Psychiatric Emergency Receiving Emergency Department since 1988." Dkt. 210 at 9 (emphasis in original). Essentially, Durkin questions whether the "psychiatric emergency receiving emergency department" qualifies as a "general acute hospital emergency department" under section 1799.110. Durkin also questions whether Dr. Wapen has had "substantial professional experience within the last five years," noting that the word "continuously" is "vague and does not speak to the number of days or hours worked during the previous 5 years such that this court can determine if his experience is substantial." Id. Given the court's obligation to view the evidence in the light most favorable to plaintiffs and draw all justifiable inferences in their favor, Durkin must do more than merely raise questions about Dr. Wapen's qualifications in order to exclude his testimony.

As to the second challenge, Durkin argues that Dr. Wapen's testimony assumes knowledge of all of the facts of the case, not just those facts that were known to Durkin at the time of treatment. Durkin thus argues that "[t]his false assumption invalidates Dr. Wapen's opinions." Dkt. 210 at 11. Essentially, Durkin argues that Dr. Wapen's analysis is not limited to only those facts that were known to Durkin at the time that he rendered care to the decedent, and that his opinion is invalid as a result. However, Dr. Wapen's declaration does identify specific facts that were known to Durkin. For instance, Durkin's own chart indicated that Hatfield had "barricaded self in house - threatened to blow it up," that he had experienced "escalating hallucinatory behavior for 1-2 weeks," and that he was "uncooperative for exam" and "hostile." Dkt. 209-1 at 4. Durkin also testified that he found

5

Hatfield to be "violent and highly agitated," and that he ordered the administration of chemical tranquilizers because he didn't "want anyone to get hurt." Id. While Dr. Wapen's declaration is not clear in delineating which facts were known to Durkin at the time of treatment and which facts were not known to him, the court finds that, viewing the evidence in a light most favorable to plaintiffs, and drawing all reasonable inferences in their favor, plaintiffs have raised a triable issue of fact as to whether Durkin breached the applicable standard of care. Thus, as to plaintiffs' fifth cause of action (wrongful death), Durkin's motion for summary judgment is DENIED.

Durkin also moves for summary judgment on plaintiffs' first cause of action, brought under section 1983. In order to succeed on their section 1983 claim, plaintiffs must show that (1) Durkin acted under color of state law, (2) Durkin's conduct was deliberately indifferent to Hatfield's serious medical needs, and (3) Durkin's conduct proximately caused Hatfield's death. See, e.g., Z.W. v. City of San Bernadino, 2011 WL 321834 (C.D. Cal. Jan. 28, 2011). Durkin argues that there is no triable issue of fact as to either (1) or (2), and does not address (3) in his motion.

Starting with element (1), the Supreme Court has held that "state action may be found if, though only if, there is such a 'close nexus between the state and the challenged action' that seemingly private behavior 'may be fairly treated as that of the state itself.'" Brentwood Academy v. Tennessee Secondary School Athletic Ass'n, 531 U.S. 288, 295 (2001). The Court acknowledged that there is no single test for determining whether such a "close nexus" exists, and instead pointed to a "host of facts that can bear on the fairness of such an attribution." Id. at 296. For instance, if the challenged activity results from the state's exercise of "coercive power," or if the state provides "significant encouragement, either overt or covert," or if the private entity is "controlled by an agency of the state" or "has been delegated a public function by the state," state action can be found. Id. at 296. Most relevant to this case, if the private actor operates as a "willful participant in joint activity with the state or its agents," he may be considered a state actor. Id.

Plaintiffs' opposition brief focuses on the "willful participant in joint activity" test,

6

arguing that Durkin was "the gatekeeper for the government, part of a legislative scheme designed to take people into custody to mental health treatment." Dkt. 209 at 14. In support of their argument, plaintiffs cite the Ninth Circuit's opinion in Stypmann v. City and County of San Francisco, 557 F.2d 1338 (9th Cir. 1977). In Stypmann, the Ninth Circuit found that a private tow company was a state actor when it towed vehicles without providing due process to the vehicles' owners. However, the key fact in that case was that a "police officer [made] the initial determination that a car will be towed," and the tow company acted "only at the direction of the officer." Id. at 1341. "The officer designates the garage to which the vehicle will be towed," and "notifies the owner that his vehicle will be towed, the grounds for the action, and the place of storage." Id. The court thus found that "the private towing company is a 'willful participant in a joint activity with the state or its agents,'" and that there was a "close nexus" between the state and the challenged action. Id. at 1341-42. While Stypmann does shed light on the "willful participant in joint activity" test, plaintiffs have not shown that the present case is analogous. Unlike the Stypmann defendant, Durkin did not act "at the direction of" the police. Plaintiffs allege only that "[t]he police asked Durkin to clear Hatfield for incarceration so that he could be taken to jail," that "[w]ithout clearance from Durkin, the police could not take Hatfield to jail," and that "Durkin chose to send Hatfield to jail." Dkt. 209 at 14. While the police may have wanted Durkin to send Hatfield to jail, there is no evidence that the police directed Durkin to send Hatfield to jail, even viewing the evidence in the light most favorable to plaintiffs.

Nor do plaintiffs' other cited cases lend any support to their argument that Durkin was a "willful participant in joint activity" with the police. In Sable Communications v. Pacific Tel. & Tel. Co., the Ninth Circuit found that the defendant (Pacific Bell) had actively lobbied government officials to take action that would allow the disconnection of plaintiff's telephone service, which was alleged to be a violation of its First Amendment rights. 890 F.2d 184, 189 (9th Cir. 1989). By "repeatedly requesting" government officials to "undertake action that would trigger a procedure that would violate Sable's first amendment rights," Pacific Bell "satisfie[d] the joint participation requirement," and was properly

7

considered a state actor. Id. No similar facts are present in this case. Unlike Pacific Bell, Durkin did not "repeatedly request" that the state take some type of action, nor did he "invoke the aid of state officials to take advantage of state-created procedure." Id. (internal citation omitted). Plaintiffs then cite to two Supreme Court cases, neither of which support the position that Durkin was a state actor. In NCAA v. Tarkanian, the Court found that the defendant was not a state actor; and in Adickes v. S.H. Kress & Co., the Court held that a private defendant's racially discriminatory actions may constitute state action if the defendant "refused [the plaintiff] service because of a state-enforced custom of segregating the races in public restaurants." Tarkanian, 488 U.S. 179 (1988); Adickes, 398 U.S. 144, 171 (1970).

In sum, plaintiffs have shown that the police "requested" that Durkin clear Hatfield for incarceration, but have made no showing (even when viewing the evidence in the light most favorable to plaintiffs) that Durkin's ultimate decision was influenced by the police's request. As a result, plaintiffs cannot show that Durkin was a willful participant in joint activity with the state. At best, plaintiffs can establish only that Durkin's ultimate decision coincided with what the police wanted him to do. This is not enough to raise a triable issue of fact that Durkin acted under color of state law, and because plaintiffs cannot meet this element of their § 1983 claim, summary judgment is GRANTED in favor of Durkin on plaintiffs' first cause of action. Because plaintiffs cannot meet the first element of their § 1983 claim, the court need not reach the issue of whether Durkin's conduct was deliberately indifferent to Hatfield's needs.

**CONCLUSION**

As to all claims asserted against William T. Durkin, M.D., Inc., defendants' motion for summary judgment is GRANTED. As to the § 1983 claim asserted against Dr. Durkin in his individual capacity, defendants' motion for summary judgment is GRANTED. As to the wrongful death claim asserted against Dr. Durkin in his individual capacity, defendants' motion is DENIED.

Finally, the court will conduct a case management conference in this matter on

**October 17, 2013** at 2:00pm.

**IT IS SO ORDERED.**

Dated: September 5, 2013

_____
PHYLLIS J. HAMILTON
United States District Judge

9